J-S02017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| HAKEEM STANLEY | |
| Appellant | No. 3535 EDA 2013 |

Appeal from the Judgment of Sentence October 28, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013370-2011

BEFORE:  MUNDY, OLSON and WECHT, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 13, 2015**

Appellant, Hakeem Stanley, appeals from the judgment of sentence entered on October 28, 2013 in the Criminal Division of the Court of Common Pleas of Philadelphia County.  We affirm.

The trial court summarized the relevant facts as follows:

On September 11, 2011, at approximately 7:00 p.m., Alonzo Dennis ("Dennis"), was at the home of Tyrell Herbin ("Herbin"), located near 51st Street and Harlan Street in the City of Philadelphia.  Dominick Simpson ("Simpson") and Herbin's five-year-old son, [Q.], were present as well.  Simpson was playing with [Q.] in the front yard of the home when the son of a neighbor[,] Shaunta Byard ("Byard")[,] came and tried to join.  [Q.] told the boy to leave Simpson alone and then the two began fighting.  Byard's son began to cry and, from the porch across the street, Byard yelled at [Q.] to let her son go because if he didn't, she would call her son's older cousins to come and "rough up" [Q.].  Simpson responded to Byard's comment by stating that [Q.] had cousins too.  Simpson and Byard began to argue; Byard stating that she would "get somebody to f[**]k him up" and Simpson responding that he would "get his girl to f[**]k her

up." Herbin told Simpson to stop arguing with Byard, and the men went back into Herbin's house.

Ten minutes after the altercation, Dennis, Herbin, Simpson, and [Q.] left Herbin's home and walked to a deli near 52nd Street and Master Street. They entered the deli, purchased beer, and exited. While leaving the deli between 52nd and Master Street, a man came up from behind and shot Dennis in the back of the head. The shooter then proceeded to run up Master Street towards 53rd Street. When officers arrived on scene, Dennis was unresponsive, and he was pronounced dead. Herbin and Simpson later identified the shooter to police as [Appellant].

[Appellant] could not be located by police officers and was referred to the homicide fugitive squad on September 15, 2011. On October 2, 2011, Philadelphia Police corporal Marvin Burton observed [Appellant] on [the] 5700 block of Thompson Street; however, when [Appellant] made eye-contact with Corporal Burton, he ran and disappeared down the alleyway on the 1300 block of North 58th Street. On November 2, 2011, Officer Tilghman received a radio call for the 1300 block of North 58th Street regarding a male who wanted to turn himself in for a homicide. When Officer Tilghman responded to the location, a female initially told the officers that [Appellant] was not there; however, the officers heard someone say that they were down in the basement and [Appellant] came up from the basement moments later and was arrested.

[Appellant] was charged with and found guilty of [first-degree murder], [c]arrying [f]irearms [w]ithout a [l]icense [], [c]arrying [f]irearms on [p]ublic [p]roperty in Philadelphia [], [p]ossession of [i]nstrument of [c]rime ("PIC")[,] and [p]ossession of [f]irearms by [p]rohibited [p]erson [] on bill of information CP-51-CR-0013370-2011. These charges arose from the shooting death of [] Dennis on September 11, 2011 near 52nd Street and Master Street in the City of Philadelphia. []

On October 22, 2013, [Appellant entered a plea of not guilty and proceeded to a jury trial]. On October 28, 2013, the jury found [Appellant] guilty of [first-degree murder], [c]arrying [f]irearms [w]ithout a [l]icense [], [c]arrying [f]irearms on [p]ublic [p]roperty in Philadelphia [], and [PIC]. Following the jury verdict, the Commonwealth and [Appellant] stipulated to the fact that [Appellant] had the requisite predicate offense for a

- 2 -

conviction under [possession of firearms by prohibited person] and th[e trial] court entered a finding of guilt on that charge. At the conclusion of the trial, th[e trial] court sentenced [Appellant] to [l]ife imprisonment without parole on the homicide charge and 5-10 years of imprisonment on the [possession of firearms by prohibited person] charge, to run consecutively. He received no further penalty on the remaining charges.

On November 11, 2013, [Appellant filed a notice of appeal. Thereafter,] on January 6, 2014, upon completion of the notes of testimony, [Appellant] was served an [o]rder directing him to file a concise statement of [errors] complained of on appeal pursuant to Pa.R.A.P. 1925(b). On January 16, 2014, th[e trial] court received Stanley's 1925(b) [statement].

Trial Court Opinion, 4/1/14, at 1-4.

Appellant's brief raises the following questions for our review:

Whether the [t]rial [c]ourt erred and unfairly prejudiced Appellant when it allowed a witness to testify despite the fact that the witness disregarded the judge's sequestration order and was present in the courtroom for testimony of other witnesses[?]

Whether the [t]rial [c]ourt erred and unfairly prejudiced Appellant when it denied Appellant's [m]otion in [l]imine, allowing the jury to view a YouTube video[?]

Whether the [t]rial [c]ourt erred when it denied Appellant's [m]otion for a [j]udgment of [a]cquittal, because the evidence adduced at trial was not sufficient to prove beyond a reasonable doubt that Appellant shot the victim[?]

Appellant's Brief at 4.

In reviewing the contentions raised by Appellant, we have carefully examined the submissions of the parties, the certified record, and the opinion issued by the trial court. Based upon our review, we conclude that Appellant's claims do not merit relief for the reasons set forth in the trial court's opinion. In particular, we note the following findings and conclusions

- 3 -

reached by the trial court, which find ample support in the record and are legally sound:

> **Alleged trial court error in permitting Commonwealth witness Tyrell Herbin to testify after he violated the court's sequestration order.**
>
> * The trial court found that Herbin's violation of the sequestration order was neither willful nor deliberate since he arrived late to court and was not present when the order was issued.
>
> * Herbin was only present in the courtroom for the testimony of Lieutenant Lemont Adams (a police investigator who responded to an emergency call) and Dr. Marlon Osbourn (a medical examiner). Herbin was not present during the testimony of other fact witnesses who were present during the shooting.
>
> * As a remedy for Herbin's violation of the sequestration order, the trial court granted counsel broad leeway in examining Herbin regarding his presence in the courtroom during earlier testimony and any potential impact his presence may have had on the testimony he gave.
>
> * The trial court instructed the jury that it could consider Herbin's violation of the sequestration order when evaluating the credibility of his in-court testimony.
>
> * In considering the court's remedy, cautionary instruction, and the testimony placed before the jury, there was no likelihood of an adverse impact upon the outcome of the trial and, hence, no abuse of discretion in allowing Herbin to testify.
>
> **Alleged trial court error in denying Appellant's motion *in limine* to preclude jurors from viewing a YouTube video.**
>
> * The portion of the video introduced at trial showed Appellant speaking as himself, not as his rap persona or alter ego. Moreover, the video clip illustrated that, while Appellant was moving away from street life to pursue his rap career, he remained willing to exact revenge against

anyone who inflicted harm upon him or a member of his family.

\* Appellant's statement in the video was probative of issues in the present case since the shooting followed an argument between Appellant's cousin and her neighbor and the video was uploaded to YouTube six days after the victim was murdered.

\* The Commonwealth was able to authenticate the video through examination of the technician who downloaded it from YouTube.

\* The trial court omitted portions of the video that referred to Appellant's stage name "Kill Keem."

\* There was no error in the introduction of Appellant's YouTube video because it was relevant, its probative value outweighed any prejudicial effect, and the Commonwealth properly authenticated the evidence.[1]

**Alleged trial court error in denying Appellant's motion for judgment of acquittal grounded on Appellant's claim that the evidence was insufficient to prove beyond a reasonable doubt that Appellant shot the victim.**

\* The trial court noted that both Herbin and Simpson gave statements to police and identified Appellant as the shooter.

\* Following efforts to evade capture, Appellant presented himself to officers who responded to a radio call for a male seeking to turn himself into authorities for a homicide.

_____

[1] Our review of the record reveals another ground for affirming the trial court on this issue. Appellant's motion *in limine* sought only to preclude the Commonwealth from introducing evidence of the name Appellant used as a rap performer. The motion did not raise the precise claim Appellant now advances, *to-wit* the contention that the Commonwealth should not have introduced Appellant's statements from his YouTube video. Because Appellant did not raise this claim before the trial court, it is subject to waiver. ***See*** Pa.R.A.P. 302(a).

    * The evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to allow the jury to find beyond a reasonable doubt that Appellant shot the victim.

Trial Court Opinion, 4/1/14, at 4-12.

    Because the trial court adequately and accurately assessed the claims raised by Appellant on appeal, we adopt its opinion as our own. The parties are instructed to include a copy of the trial court's opinion with all future filings pertaining to our disposition in this case; however, the name of Herbin's minor son shall be redacted and only identified by his initial.

    Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/13/2015

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
TRIAL DIVISION – CRIMINAL SECTION

FILED

COMMONWEALTH OF PENNSYLVANIA        :

v.                                  :        CP-51-CR-0013370-2011

HAKEEM STANLEY                      :

## OPINION

CARPENTER, J.                                          April 1, 2014

Defendant Hakeem Stanley ("Stanley") was charged with and found guilty of

Murder of the First Degree (H1), Carrying Firearms Without a License ("VUFA § 6106")

(F3), Carrying Firearms on Public Property in Philadelphia ("VUFA § 6108") (M1),

Possession of Instrument of Crime ("PIC") (M1) and Possession of Firearms by

Prohibited Person ("VUFA § 6105") (F2) on bill of information CP-51-CR-0013370-2011.

These charges arose from the shooting death of Alonzo Dontay Dennis on September

11, 2011 near 52nd Street and Master Street in the City of Philadelphia. This court

requests that the Superior Court uphold the convictions and affirm the sentence

imposed in this matter.

## PROCEDURAL HISTORY

On October 22, 2013, Stanley elected to exercise his right to a jury trial

and pled not guilty to the above listed charges. On October 28, 2013, the jury

found Stanley guilty of Murder of the First Degree (H1), Carrying Firearms Without a License ("VUFA § 6106") (F3), Carrying Firearms on Public Property in Philadelphia ("VUFA § 6108") (M1), and Possession of Instrument of Crime ("PIC") (M1). Following the jury verdict, the Commonwealth and Stanley stipulated to the fact that Stanley had the requisite predicate offense for a conviction under VUFA § 6105 and this court entered a finding of guilt on that charge. At the conclusion of the trial, this court sentenced Stanley to Life imprisonment without parole on the homicide charge and 5-10 years of imprisonment on the VUFA § 6105 charge, to run consecutively. He received no further penalty on the remaining charges.

On November 11, 2013, this court received a Notice of Appeal and on January 6, 2014, upon completion of the notes of testimony, Stanley was served an Order directing him to file a concise statement of the matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On January 16, 2014, this court received Stanley's 1925(b) response which raised the following issues on appeal:

1. That [this] court erred and unfairly prejudiced Appellant when it allowed a Commonwealth witness to testify despite the fact that the witness disregarded [this court's] sequestration order and was present in the courtroom for testimony of at least one other witness for the Commonwealth.

2. That [this] court erred and unfairly prejudiced Appellant when it denied Appellant's Motion in Limine and allowed the jurors to view a YouTube video of Appellant.

3. That [this] court erred when it denied Appellant's Motion for a Judgment of Acquittal, because the evidence adduced at trial was not sufficient to prove beyond a reasonable doubt that Appellant shot the victim.

2

## FACTS

On September 11, 2011, at approximately 7:00 p.m., Alonzo Dennis ("Dennis"), was at the home of Tyrell Herbin ("Herbin"), located near 51st Street and Harlan Street in the City of Philadelphia. Dominick Simpson ("Simpson") and Herbin's five-year-old son, Q., were present as well. Simpson was playing with Q. in the front yard of the home when the son of neighbor Shaunta Byard ("Byard") came and tried to join. Q. told the boy to leave Simpson alone and then the two began fighting. Byard's son began to cry and, from the porch across the street, Byard yelled at Q. to let her son go because if he didn't, she would call her son's older cousins to come and "rough up" Q. Simpson responded to Byard's comment by stating that Q. had cousins too. Simpson and Byard began to argue; Byard stating that she would "get somebody to fuck him up" and Simpson responding that he would "get his girl to fuck her up." Herbin told Simpson to stop arguing with Byard, and the men went back into Herbin's house.

Ten minutes after the altercation, Dennis, Herbin, Simpson, and Q. left Herbin's home and walked to a deli near 52nd Street and Master Street. They entered the deli, purchased beer, and exited. While leaving the deli between 52nd and Master Street, a man came up from behind and shot Dennis in the back of the head. The shooter then proceeded to run up Master Street towards 53rd Street. When officers arrived on scene, Dennis was unresponsive, and he was pronounced dead. Herbin and Simpson later identified the shooter to police as defendant Stanley.

The defendant could not be located by police officers and was referred to the homicide fugitive squad on September 15, 2011. On October 2, 2011, Philadelphia

3

Police Corporal Marvin Burton observed Stanley on the 5700 block of Thompson Street; however, when Stanley made eye-contact with Corporal Burton, he ran and disappeared down the alleyway on the 1300 block of North 58th Street. On November 2, 2011, Officer Tilghman received a radio call for the 1300 block of North 58th Street regarding a male who wanted to turn himself in for a homicide. When Officer Tilghman responded to the location, a female initially told the officers that Stanley was not there; however, the officers heard someone say that they were down in the basement and Stanley came up from the basement moments later and was arrested.

## DISCUSSION

### Witness testimony after violation of sequestration order

The selection of a remedy for the violation of a court sequestration order is a matter within the sound discretion of the trial court and the court's ruling will be reversed only upon a finding that there was no reasonable ground for the action taken.[1] In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial.[2]

On appeal, Stanley asserts that this court erred in permitting Commonwealth witness Tyrell Herbin to testify after he had violated this court's sequestration order. This court disagrees. This court was notified of Mr. Herbin's presence in the courtroom following the testimony of Lieutenant Adams. Upon questioning Mr. Herbin, this court determined that he had arrived late to court and was not present at the time of the

---

[1] *Com. v. Smith*, 346 A.2d 757, 760 (Pa. 1975).
[2] *Id.*

4

sequestration order. Thus, in assessing the seriousness of the violation, this court concluded that Mr. Herbin's violation of the sequestration order was neither willful nor deliberate. This court further determined that Mr. Herbin had been present in the courtroom for the testimony of Lieutenant Adams as well as the testimony of the medical examiner, Dr. Marlon Osbourne. As a remedy for any possible impact that the violation may have had on Mr. Herbin's testimony, this court permitted counsel to question Mr. Herbin regarding his presence in the courtroom during the earlier testimony. The questioning direct examination provided the following:

> MR. MACARTHUR: All right. Now, were you present in court this morning when the lieutenant? Do you remember the lieutenant, the African American lieutenant was testifying?
> WITNESS: Yes.
> MR. MACARTHUR: Were you present when he was testifying?
> WITNESS: Yes.
> MR. MACARTHUR: Did you know that you weren't supposed to be in the courtroom?
> WITNESS: No. Nobody told me.
> MR. MACARTHUR: Okay. Did you hear the lieutenant's testimony?
> WITNESS: Yeah.
> MR. MACARTHUR: Did the lieutenant's testimony in any way change the facts that you're telling the jury today?
> WITNESS: No.[3]

Subsequent questioning during cross-examination further provided:

> MR. TINARI: Police came immediately on the scene, correct?
> WITNESS: Correct.
> MR. TINARI: And did you speak to the police officer?
> WITNESS: Yes.
> MR. TINARI: Was it the lieutenant?
> WITNESS: I'm not sure.
> MR. TINARI: Well, when you saw him testifying did you recognize him?
> WITNESS: They all wear uniforms. I don't look into the face.
> MR. TINARI: I'm sorry?
> WITNESS: I don't pay faces any mind. They all got on uniforms. I know I talked to a officer.
> MR. TINARI: You talked to an officer.

---

[3] N.T. 10/22/2013 at 160:8-25.

5

WITNESS: Yeah.

MR. TINARI: And you told the officer that you were in the deli when the incident occurred, correct?

WITNESS: Correct.

MR. TINARI: And that's true, correct?

WITNESS: Yes. Well, let me. Let me clear it up.

MR. TINARI: Do you want to explain it now after hearing what he had said?

WITNESS: No. I'm talking about it didn't happen while I was in the deli. It happened while we were outside leaving the deli.

MR. TINARI: So when you heard the detective say that you told him that you were in the deli when it happened, the detective is or the lieutenant is not being truthful, right?

WITNESS: I wouldn't say that.

MR. TINARI: Well, what would you say then? If he said that, what would you say?

WITNESS: I would say it's like a error.

MR. TINARI: It's an error. Did you ever in going over all this paperwork and prior to your coming in to testify, did you ever tell this prosecutor that the lieutenant is in error?

WITNESS: I don't know what the lieutenant put in his report.

MR. TINARI: Well, you heard. You heard what he said in this courtroom, didn't you?

WITNESS: Yeah.

MR. TINARI: So that what he says that you said, you're just saying that he made a mistake; is that right? Would that be a characterization?

WITNESS: Correct.[4]

Counsel was free to question Mr. Herbin regarding his violation of the sequestration order and the jury was able to evaluate his testimony and assess his credibility as a witness. Additionally, this court provided the following cautionary instruction to the jury with regard to Mr. Herbin's testimony:

> Now, during this trial, I had ordered that witnesses are sequestered so that they cannot learn of other witnesses' testimony. You have heard that Mr. Tyrell Herbin violated this order. You may use the fact that Mr. Herbin violated the sequestration order to evaluate the credibility of his in-court testimony.[5]

---

[4] N.T. 10/22/2013 at 185-187.

[5] N.T. 10/24/2013 at 94.

6

In consideration of this court's remedy, cautionary instruction, and the testimony presented to the jury, this court concluded that there would not be any probable impact on the outcome of the trial and thus, properly permitted Mr. Herbin to testify.

### *Denial of defense's motion in limine regarding a YouTube video*

The admissibility of evidence is a matter within the sound discretion of the trial court and will not be reversed by a reviewing court absent an abuse of discretion.[6] An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill-will, partiality, prejudice, manifest unreasonableness, or misapplication of law.[7] As a preliminary matter, the trial court must determine that the evidence sought to be introduced is relevant, meaning that it "tends to make a fact in issue more or less probable."[8] All relevant evidence is admissible, unless otherwise provided by law; however, the court may exclude such evidence if there is a danger that unfair prejudice will outweigh its probative value.[9] "Unfair prejudice" indicates a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."[10] The Supreme Court of Pennsylvania emphasized this balancing test when it established that a trial court should exclude otherwise relevant evidence if, in the court's judgment, "its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial."[11] With regard

---

[6] *Com. v. Weiss*, 776 A.2d 958, 967 (Pa. 2001).

[7] *Com. v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013).

[8] Pa.R.E 401; *Com. v. Mitchell*, 902 A.2d 430, 465 (Pa. 2006).

[9] Pa.R.E. 402; Pa.R.E. 403; *Com. v. Mitchell*, 902 A.2d 430, 465 (Pa. 2006).

[10] Pa.R.E. 403 cmt.

[11] *Com. v. Ulatoski*, 371 A.2d 186, 192 (Pa. 1977) (citing J. McCormick, Evidence § 190, at 453-54 (2d ed. 1972).

7

to the admission of videotaped evidence, the trial court must afford additional scrutiny in determining its admission.[12] First, the video must be authenticated by any witness familiar with the subject matter who can testify that the tape was an accurate and fair depiction of the events sought to be shown.[13] Second, the trial court should view the recording in camera prior to showing it to the jury.[14]

On appeal, Stanley claims that this court erred in denying his motion in limine to preclude the jurors from viewing a YouTube video making reference to his rap name "Kill Keem". This court disagrees. For ease on review, the web address of the YouTube video at issue is http://www.youtube.com/watch?v=V4XhyoYkImQ. This court permitted the Commonwealth to admit the YouTube video that it sought to show to the jury as evidence of motive. The video portrayed Stanley rapping and, most poignantly, talking about his rap career and the change it had made in his life. The transcript of the portion of the video that the Commonwealth sought to show to the jury was read by the prosecutor as follows:

> *It's, quote:* If you wanna rap, go ahead and rap and do everything you're supposed to do. But if you wanna be out here on the streets, I don't want to do this shit. Do you feel what I'm saying? Running up and down these streets doing all this shit. If you still want to be out here, you might as well delete your Twitter and just go run around shooting niggas, beating niggas up, taking shit from niggas. You know what I'm saying? The shit touched me so I felt like this is the change. Do you feel what I'm saying? For Kill Keem.
>
> *And then his friend says:* But don't get it fucked up.
>
> *And the defendant says, quote:* Don't get it fucked up. Don't get it fucked up. Because if you try to harm me or anyone in my family or stop me from getting my money, like, feel me, I'm still him but I'm smart now.[15]

---

[12] *Com. v. Impellizzeri,* 661 A.2d 422, 428 (Pa. Super. 1995).
[13] *Id.*
[14] *Id.*
[15] N.T. 10/21/2013 at 216-217.

These words, spoken by the defendant himself, illustrate that Stanley was moving on from the street life in pursuit of his rap career; however, he makes it explicitly clear that if someone were to harm him or his family or prevent him from getting him from getting his money, he is still that person involved in the street life. These words were extremely probative in the instant case, as the shooting at issue stemmed from an earlier series of threats exchanged between Simpson and Byard, Stanley's cousin, and an earlier scuffle between Byard's son and Q. Moreover, the Commonwealth was able to authenticate the video through the examination of the technician who downloaded the video from YouTube and made the screen capture of the information indicating that the video was uploaded to YouTube on September 17, 2011, which was six days after the murder of Alonzo Dennis.

Although this court permitted the jury to view the relevant portion of the YouTube video, this court required that the stamps on the bottom of the screen that read "Kill Keem" and "Heavy Spitters" be removed from the jury's view. This court reasoned that while the words of the defendant were more probative than prejudicial in showing Stanley's motive for the shooting, the stationary stamps could not be explained, held no probative value, and merely served to prejudice the defendant. Additionally, despite the Commonwealth's request to introduce only a 45 second portion of the 14 minute video, this court indicated that additional clips, or even the video in its entirety, could be shown to the jury, if requested by the defense for the purpose of context. Stanley elected not to have additional portions of the video shown to the jury.

In consideration of the discussion above, this court has found that the portion of the video shown to the jury was relevant, more probative than prejudicial, and was

9

properly authenticated; thus this court's denial of the defense's motion in limine was proper.

### Denial of motion for judgment of acquittal

A motion for judgment of acquittal shall be granted only in cases in which the Commonwealth has failed to carry its burden regarding the sufficiency of the evidence to sustain a conviction on a particular charge.[16] The standard applied when reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.[17] In applying this test, the Superior Court may not weigh the evidence and substitute its judgment for that of the fact-finder. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless, the evidence is so weak and inconclusive that as a matter of law, no probability of fact may be drawn from the combined circumstance.[18] The Commonwealth may satisfy its burden of proving an element of the crime beyond a reasonable doubt through the use of wholly circumstantial evidence. In applying the test, the whole record must be evaluated and all evidence received must be considered.[19]

On appeal, Stanley avers that this court erred in denying his motion for judgment of acquittal at the close of the Commonwealth's case-in-chief, claiming that the

---

[16] *Com. v. Abed*, 989 A.2d 23, 26 (Pa. Super. 2010).
[17] *Com. v. Heberling*, 678 A.2d 794, 795 (Pa. Super. 1996) (citing *Com. v. Williams*, 650 A.2d 420 (Pa. 1994)).
[18] *Com. v. Cassidy*, 668 A.2d 1143, 1144 (Pa. Super. 1995).
[19] *Com. v. Valette*, 613 A.2d 548, 549 (Pa. 1992).

10

evidence was not sufficient to prove beyond a reasonable doubt that Stanley shot the victim. This court disagrees. At trial, the jury heard testimony from numerous civilian witnesses, police officers, and detectives, as well as the medical examiner, Dr. Osbourne. The testimony of Tyrell Herbin and Dominic Simpson established that Simpson had been arguing with Herbin's neighbor, Shaunta Byard. Initially, Byard yelled at Herbin's son, Q. to stop fighting with her son because if he didn't, she would call her son's older cousins to come and rough him up. Simpson responded to Byard's comment by stating that Q. had cousins too. The argument continued with Byard stating that she would "get somebody to fuck him up" and Simpson responding that he would "get his girl to fuck her up."[20] Shortly thereafter, Herbin, his son Q. Simpson and Dennis walked up Harlan Street to the deli at 52nd and Master Street and saw Stanley – Byard's cousin – walking toward Byard's house on the other side of the street. The men went into deli, purchased beer, exited, and as they were leaving Herbin peripherally saw an arm raise up to the back of Dennis' head and heard the shot. Dennis immediately dropped to the ground and Herbin and Simpson saw Stanley run up Master Street toward 53rd Street. Both Herbin and Simpson gave statements to police and identified Stanley as the shooter.

Officer Yatcilla, Officer McCoy, Officer Mastalski, and Lieutenant Adams all testified about their respective responses to the scene at 52nd Street and Master Street. Officer Mastalski testified that he obtained flash information of the shooter from Herbin and Simpson to broadcast over police radio. Lieutenant Adams testified that Herbin and Simpson indicated that they were present at the time of the shooting, but were inside the deli when the shooting happened while the victim was waiting outside. Although the

---

[20] N.T. 10/22/2013 at 200:16-18.

11

Lieutenant's testimony conflicted with that of Herbin and Simpson, with regard to their location at the time of the shooting, the jury was free to assess the credibility of all of the witnesses and take such assessments into consideration when viewing all of the evidence presented at trial. Further, Detective Williams testified that he took statements from Herbin and Simpson, both of whom identified Stanley as the shooter by name and by photo. Moreover, the collective testimony of Detective Nordo, Detective Cahill, Corporeal Burton, and Officer Tilghman established Stanley's evasion of police through November 2, 2010, when he ultimately presented himself to the officers responding to a radio call for a male who wanted to turn himself in for a homicide. This court, in viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, has determined that the evidence was sufficient to enable the jury to find, beyond a reasonable doubt, that Stanley shot Alonzo Dennis.

## CONCLUSION

For the reasons set forth in this Opinion, the Superior Court should affirm this court's admission of evidence, the jury's finding of guilt, and the sentence imposed in this matter.

Carpenter, J.

12